IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RAFI BENLIAN** | : | **CIVIL ACTION** |
| *Plaintiff, pro se* | : | |
| v. | : | **NO. 15-2128** |
| | : | |
| **PECO ENERGY CORPORATION and** | : | |
| **EXELON CORPORATION** | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                                          July 20, 2016

## MEMORANDUM OPINION

**INTRODUCTION**

On April 21, 2015, Plaintiff Rafi Benlian ("Benlian"), proceeding *pro se*, commenced a civil action against Defendants PECO Energy Company and Exelon Corporation (collectively "Defendants"), alleging that during the period of April to June 2013, the electric service to his home was shut off by Defendants' employees. Benlian asserts that Defendants' conduct (1) violated his equal protection and procedural due process rights guaranteed by the Fourteenth Amendment of the United States Constitution; (2) constituted an unlawful conspiracy to interfere with his civil rights under 42 U.S.C. § 1985(3); and (3) violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("§ 504"). [ECF 3].

On August 31, 2015, Defendants filed the instant *motion to dismiss* pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).¹ Even though Benlian filed several letters, after

---

¹ While Defendants seek dismissal of the amended complaint under Rules 12(b)(1) and 12(b)(6), their argument that the amended complaint should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) is premised on the argument that Benlian fails to state a valid civil rights or conspiracy claim. [ECF 8 at 8]. Benlian, however, asserts federal claims based on an alleged violation of his equal protection and procedural due process rights, conspiracy under 42 U.S.C. § 1985(3), and a violation of § 504. All three of these purported claims are grounded on federal law, which confers this Court with jurisdiction. *See* 28 U.S.C. § 1331. Whether Benlian's allegations are sufficient to state valid

the motion to dismiss was filed, addressing his issues and objections, Defendants contend that their motion is unopposed, because Benlian has not filed a formal response to the motion consistent with Local Rule of Civil Procedure 7.1(c). Following a careful review of these issues, and for the reasons herein articulated, Defendants' motion to dismiss is granted.

**BACKGROUND**

The relevant factual allegations, as gleaned from Benlian's 40-page amended complaint, [ECF 3], and which this Court must accept as true and construe in the light most favorable to Benlian,[2] are summarized as follows:

> Rafi Benlian is a resident of Havertown, Pennsylvania, (Am. Compl. ¶ 3), and a 100% service disabled veteran. *Id.* at ¶¶ 5, 8. Benlian has been diagnosed as suffering from rheumatoid arthritis, immune system deficiency, hearing loss and hyperacusis,[3] hernias, Restless Leg Syndrome, and difficulty of breathing. *Id.* at ¶¶ 1, 5, 7. In 1995, the Department of Veterans Affairs or Veterans Administration ("VA") provided Benlian with pulmonary breathing equipment, which he has used daily ever since for six to nine hours. *Id.* at ¶ 8. To accommodate his particular health needs, Benlian moved into a room in the rear of his home which had been converted from a car port. *Id.* at ¶ 9.
>
> Defendant PECO Energy Company ("PECO") is a Pennsylvania electric and gas utility provider, and a subsidiary of Defendant Exelon Corporation ("Exelon"), which is headquartered in Illinois. *Id.* at 2, 26-27, ¶¶ 10, 14. Prior to the summer of 2012, Benlian had had no disputes with Defendants. *Id.* at ¶ 10.
>
> In October 2008, the Pennsylvania General Assembly approved Act 129 of 2008 ("Act 129"), which required electric distribution companies with more than 100,000 customers to install digital smart meter technology. 66 Pa. C.S. § 2807(f); Am. Compl. ¶¶ 11-12.[4] Act 129 does not permit customers to opt out of the installation of smart meters and mandates that "[e]lectric distribution companies shall furnish smart meter technology." 66 Pa. C.S. § 2807(f)(2). In

---

claims is properly considered under Rule 12(b)(6). Thus, this Court will consider Defendant's motion under Rule 12(b)(6).

[2] *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

[3] Hyperacusis is a disorder in loudness perception.

[4] *See also* Exhibit "C(e)1." [ECF 3-1].

October 2009, the U.S. Department of Energy awarded Defendants $200 million for the smart meter/smart grid technology. Am. Compl. ¶ 12.[5]

Sometime in mid-August 2012, Benlian's analog meter located in the rear of his home was replaced with a smart meter. *Id.* at ¶ 17. Some days thereafter, Benlian began experiencing unusual physical symptoms, including headaches with neck pain, waking several times during the night to debilitating pain while hooked up to the pulmonary breathing equipment, and a worsened arthritic condition. *Id.* at ¶ 19-20. Benlian had not experienced these symptoms prior to the installation of the smart meter. In addition, Benlian noticed that his hearing aids made pulsating and hissing sounds within 30 feet from the smart meter, *id.* at ¶ 21, and that the family cat, which favored a habitat five to six feet from the exterior wall on which the smart meter was installed, became lethargic, started vomiting, and lost weight. *Id.* at ¶ 23.

Benlian attempted to reach a supervisor of Defendants to report the negative impact he had experienced and observed since the smart meter's installation. He spoke with Defendants' customer service representatives, who advised him that the smart meter installation was mandatory and that customers could not opt out and, therefore, there was nothing that could be done. *Id.* at ¶¶ 24-25. One week later, Benlian noticed that the smart meter's cover appeared to have been replaced to make it look as if the meter had been there for a longer time, rather than just recently installed. *Id.* at ¶ 26.

After researching the purported dangers of electromagnetic emissions that emanated from smart meters, Benlian concluded that the onset of his unusual physical symptoms was due to the smart meter. On September 10, 2012, Benlian submitted an "Affidavit Notice" demanding that Defendants remove and replace the smart meter with a no-radiation emitting analog meter; otherwise, he would replace it himself with an analog meter. *Id.* at ¶¶ 27-34.[6] That same day, an employee of PECO called Benlian to inform him that PECO received the Affidavit Notice and that the smart meter had been on his property for ten years. *Id.* at ¶ 34. Benlian surmised that PECO ignored his Affidavit Notice; he removed the smart meter and shipped it back to Defendants, along with photographs of the

---

[5] *Id.*
[6] The Affidavit Notice provided that:

[I]f within 14 days of delivery of the notice, PECO fails to replace all radiation emitting devices or fails to rebut all points raised in the document with facts, evidence, truth and law, with a sworn statement . . . by a fully identified, responsible and qualified officer of PECO/EXELON. [sic] Mr. Benlian will replace the offending meter with a safe, and lawful analog meter – calibrated and zeroed upon installation, within specifications for standard industry use.

Exh. "G1." [ECF 3-1].

meter reading prior to its replacement, and a copy of the Affidavit Notice with the following command: "DEFAULT – NO TIMELY OR VALID REBUTTAL OR COMPLIANCE." *Id.* at ¶¶ 35-36. Within days of replacing the smart meter with an analog meter, Benlian noticed that his headaches and neck pain had subsided and his sleep had improved. *Id.* at ¶ 37. He continued to pay his utility bills. *Id.* at ¶ 40.

On December 4, 2012, Benlian was notified by PECO that an electric power suspension/shut off ("shut off") was scheduled for December 17, 2012, because he had not provided access to the meter, and was directed to call Defendants to provide such access. *Id.* at ¶ 41. Benlian contacted Defendants and spoke with "Mr. Ware," who acknowledged that another customer, whose pre-existing medical condition was aggravated by a smart meter, had submitted an Affidavit Notice and Demand for removal of the smart meter, which resulted in Defendants' accommodation of that customer's specific needs by installing a smart meter on a pole in the backyard, away from the house. *Id.* at ¶¶ 44-45. Mr. Ware represented that such an option could be implemented for Benlian. The scheduled December 17, 2012 shut off did not occur. *Id.* at ¶¶ 46-47.

On December 22, 2012, Benlian received two letters from Defendants, one from PECO's Medical Certification Verification Department informing him that it had been contacted and requested medical documentation to prove that Benlian had serious medical issues. The second letter advised him of an electricity shut off that would occur on December 26, 2012. *Id.* at ¶ 49.[7] In response, Benlian had his physicians, Dr. P. Taylor and Dr. Mark Monaco, submit documentation to PECO. Dr. Monaco also stated that Benlian would need to use the electrically-operated pulmonary equipment for the rest of his life. The documentation from Benlian's doctors purportedly prevented the December 26, 2012 shut off. *Id.* at ¶ 50.

On April 6, 2013, an employee of Defendants came to Benlian's residence to install a smart meter. Benlian refused entrance and the employee left a shut off notice which was scheduled for April 12, 2013. *Id.* at ¶ 57. Benlian contacted his doctors who, again, submitted medical documentation to Defendants. The documentation was returned, marked "VOID – We are returning the enclosed request for medical certification, which has been denied." *Id.* at ¶ 58. The shut off, however, did not occur on April 12, 2013. *Id.* at ¶ 60.[8]

On April 24, 2013, 12 or more of Defendants' employees arrived at Benlian's residence, wearing hard hats, dark glasses, and no name tags, accompanied by three large specialty trucks and six or seven small trucks, which converged in front of Benlian's property in "a very intimidating manner." *Id.* at

---

[7] *See also* Request for Medical Certification, Exh. "K1"; 72 Hours Shut Off Notice, Exh. "L1."
[8] The amended complaint indicates that no shut off took place on April 12, 2012 – this appears to be a typographical error.

¶ 62. One of the employees, allegedly a supervisor, indicated that they were there to replace Benlian's analog meter with a smart meter, or else the electric power to the house would be shut off. *Id.* at ¶ 63. When Benlian asked for identification, the employee stated that he was familiar with Benlian's case and that he was "a member of the 'committee' that decided to serve [Benlian] with this ultimatum." *Id.* at ¶ 64. Benlian protested that the installation of the smart meter would worsen his compromised health condition. *Id.* at ¶ 65. The electricity, nonetheless, was shut off. *Id.* at ¶ 66. Benlian, of Armenian descent, likened this incident to that of the Armenian Genocide of 1915, commemorated on April 24, in that PECO's shut-off "arbitrarily deprived R. Benlian of life" without due process, reminiscent of the loss of property, liberty, and lives during the aforesaid historic event. *See id.* at ¶¶ 61, 67.

Benlian expressed concerns to Defendants about the electrical shut off affecting, among other things, the ability to charge batteries for his hearing aids, cellular phone, and pulmonary apparatus; the lack of heat because the house's gas furnace required an electric motor to circulate air, and the temperatures in mid-April 2013 were as low as the mid-20s Fahrenheit at night and in the early morning hours. *Id.* at ¶ 76. Conversely, during the last week of May 2013, while Benlian's electricity was still turned off, temperatures reached above 90 degrees which prohibited the use of his pulmonary equipment because it could not be used at temperatures above 83 degrees. As a result, Benlian spent several nights in his car, engine running and windows cracked open, to use the pulmonary equipment. *Id.* at ¶ 80.

In April 2013, Benlian met with a social worker at the Coatesville, Pennsylvania VA, who wrote a letter to Defendants about the hardship caused by the shut off. *Id.* at ¶ 81. In May 2013, with the assistance of a fellow veteran friend, Benlian was able to establish contact with "Mr. Ludwick,"[9] a supervisor of Defendants. *Id.* at ¶ 79. In early June 2013, Haverford Township commissioner, Chris Connell, Sr., came to Benlian's residence and observed that the electricity had not been restored. *Id.* at ¶¶ 81, 85. On June 11, 2013, Mr. Ludwick contacted Benlian to inform him that PECO would restore electricity, which occurred that day. Five days later, a PECO crew installed the mandated smart meter on a pole far from Benlian's house. *Id.* at ¶ 86.

Defendants argue that Benlian fails to state an equal protection or procedural due process claim, a conspiracy claim under 42 U.S.C. § 1985(3), or a claim under § 504.[10] Subsequently, Benlian filed four letters addressed to this Court. In his first letter dated September 9, 2015,

---

[9] Indicated in the amended complaint as "Mr. Ludwig."

[10] Defendants also argue that, as a threshold matter, this Court does not have subject matter jurisdiction because Benlian cannot state a claim for a civil rights violation or present any other federal question. [ECF 8].

5

Benlian advised that page 15 had been omitted from the copy of the amended complaint attached to Defendants' motion. [ECF 10].[11] Benlian argued that the information contained on page 15 "is crucial to the timeline and the description of the constitutional depravation [sic] in the complaint," but otherwise did not address the arguments made in Defendants' motion to dismiss. The second letter dated October 13, 2015, advised that electric power to his storage property in Upper Darby was shut off and that his wife was experiencing health problems. [ECF 13].

On October 1, 2015, Defendants requested that their motion be granted as uncontested pursuant to Local Rule 7.1(c) because the time period in which to formally respond to their motion had passed. [ECF 12].[12] On November 16, 2015, Defendants filed a reply in further support of their motion. [ECF 18].

On November 17, 2015, Benlian submitted a third letter that highlighted Defendants' previously described actions and cursorily refuted Defendants' argument that Benlian's claims are not based in federal law. [ECF 19]. In a subsequent fourth letter dated December 7, 2015, Benlian requested that this Court accept his letter as a "Reply Memorandum" in opposition to Defendants' motion, [ECF 20], citing as grounds the "extrinsic and intrinsic" evidence presented with the previous letter submissions. While Benlian's November 17, 2015 letter addressing Defendants' lack of federal law argument was filed beyond the response deadline provided in Local Rule 7.1(c), this Court will liberally construe all of Benlian's *pro se* correspondences as a "response" and will decline to grant Defendants' request to consider the motion as uncontested.

---

[11]     *See also* [ECF 8-1].
[12]     In the absence of a timely response, a motion may be granted as uncontested. L.R. 7.1(c).

**LEGAL STANDARD**

When considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id.* (citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)) (alterations in original). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* To survive a motion to dismiss under Rule 12(b)(6), "a plaintiff must allege facts sufficient to 'nudge [his] claims across the line from conceivable to plausible.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 570)).

In addition, "a *pro se* complaint, however unartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). When presented with a *pro se* litigant, the court has a special obligation to construe the complaint liberally. *Higgs v. Attorney Gen. of the United States,* 655 F.3d 333, 339 (3d Cir. 2011). Thus, even if a *pro se* plaintiff's claims are not set out in the clearest fashion, the court is

obligated to discern all the possible claims that the plaintiff may be alleging. *Id*. at 339 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Thomas-Warner v. City of Phila.*, 2011 WL 6371898, at *4 (E.D. Pa. Dec. 20, 2011). However, in so doing the court still determines whether a *pro se* plaintiff has alleged sufficient facts to support the claims divined from the pleadings. This policy of liberally construing *pro se* submissions is "driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Higgs*, 655 F.3d at 339 (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006)).

**DISCUSSION**

As stated, Defendants seek to dismiss the amended complaint because: Benlian (1) fails to state an actionable claim under 42 U.S.C. § 1983 ("§ 1983") for violations of civil rights/state-created danger, Fourteenth Amendment equal protection, or procedural due process; (2) has not sufficiently stated a conspiracy claim under 42 U.S.C. § 1985(3); and (3) has not sufficiently stated a claim pursuant to § 504 of the Rehabilitation Act. These contentions will be addressed *ad seriatim*.

*42 U.S.C. § 1983 Claim*

To assert a claim under 42 U.S.C. § 1983, a plaintiff must allege facts sufficient to establish that he was deprived of a federal constitutional or statutory right by a state actor. *Rhett v. Evans*, 576 F. App'x 85, 87 (3d Cir. 2014) (citing *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009)). Thus, there can be no cause of action under § 1983 absent a violation of a right secured either by the Constitution and/or the laws of the United States, *Reichley v. Pennsylvania Dept. of Agric.*, 427 F.3d 236, 244 (3d Cir. 2005), by a defendant acting under color of official authority.

*Id.* (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). That is, the defendant must be a state actor. Whether entities, such as Defendants, are "state actors" is not always obvious on its face, as there are instances where a private entity can act in such a way that it is construed as a state actor or is treated as having engaged in state action.

Although there is no "simple line" between state and private actors, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295 (2001), "[t]he principal question at stake is whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Kach*, 589 F.2d at 646 (quoting *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005)). To determine whether state action exists, a court must consider: (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1142 (3d Cir. 1995). Under any consideration, "[t]he inquiry is fact-specific." *Groman v. Twp. of Manalapan,* 47 F.3d 628, 638 (3d Cir. 1995); *see also Crissman v. Dover Downs Entm't Inc.,* 289 F.3d 231, 234 (3d Cir. 2002) (*en banc*) (noting that "the facts are crucial.").

In his amended complaint, Benlian avers that Defendants were "State Actors Functioning under the Color of State Law" pursuant to § 1983. Am. Compl. ¶ 15; 2:12-13, 24, 25. This Court takes judicial notice of Defendant Exelon's filings before the Securities and Exchange Commission and notes that Defendant Exelon is a registered public utility holding company, subject to regulation by the Securities and Exchange Commission under the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 *et seq.*, and Defendant PECO is an operating

9

company wholly owned by Exelon. As such, Defendants contend that neither one of them is a government entity or agency. (ECF 8 at 10). This Court agrees.

In *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974), the United States Supreme Court held that a privately owned and operated utility corporation, which held a certificate of public convenience issued by the Pennsylvania Utilities Commission, was not a state actor. Here, Defendants are also privately owned and operated utility companies and are not, on their face, state actors.[13]

Though Benlian concedes that *Jackson*'s holding is valid and that no state action was implicated there, he refutes the lack of state action and argues that the "mandate of (Act 129) fully qualifies the Defendants . . . as private companies functioning under 'Color of State Law' in the process of implementation of PA, (Act 129)," *id.* at ¶ 14, and that his dispute with Defendant PECO would not have occurred but for Act 129. Benlian attempts to distinguish *Jackson* by noting that his issue is the shut off of his electricity due to the installation of smart meters, while the issue in *Jackson* was electricity shut off due to nonpayment of bills. Benlian's argument, however, lacks merit.

In *Crissman*, a case involving a private corporation that owned and operated a racing facility, the Third Circuit, in reiterating its holdings in other matters addressing whether government regulation and funding convert private action to state action, held that state licensing

---

[13] That is not to say that Defendants cannot ever be state actors for purposes of § 1983. Courts in this district noted that PECO may be a state actor in certain circumstances, but that merely acting in concert with the Pennsylvania Utilities Commission does not render it a state actor. *Dunlap v. Peco Energy Co.*, 1996 WL 617777, at *2 (E.D. Pa. Oct. 23, 1996) (citing *Goadby v. Phila. Elec. Co.*, 639 F.2d 117, 120 n.2 (3d Cir.1981)). In *Dunlap*, the Court noted that when a utility company exercises a traditionally governmental power, such as eminent domain, state action may be present, but mere business activities such as furnishing electrical power are not state functions. *Id.* The court, quoting *Jackson*, noted that the critical inquiry is "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the State itself." *Id.* (quoting *Jackson*, 419 U.S. at 351).

was not enough to make a private entity a state actor, and that "*regulation* – even detailed regulation, as we have here – does *not* equate to state action," *Crissman*, 289 F.3d at 243 (emphasis provided). Moreover, "the flow of funds does not implicate the state in private activity." *Id.*; *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) ("That a private entity performs a function which serves the public does not make its acts state action."); *Thompson v. Eva's Vill. and Sheltering Program*, 243 F. App'x 697, 698 (3d Cir. 2007) (citing *Leshko v. Servis*, 423 F.3d 337, 341 (3d Cir. 2005) (regulation and receipt of government funds, without more, does not constitute state action)).

Guided by these decisions, this Court concludes that the regulation requiring utility companies to install smart meters without an opt-out provision, as required by Act 129, is the kind of detailed regulation which does not equate to a state action. The installation of smart meters, and the provision of electricity to customers such as Benlian, is a business activity, and not a state function or a state action. The installation of smart meters pursuant to Act 129 does not create a sufficiently close nexus between the Commonwealth of Pennsylvania and the Defendants for the Defendants' actions to be treated as state action. Furthermore, Defendants' $200 million grant from the U.S. Department of Energy does not implicate the State in private activity. Therefore, in light of the well-settled case law cited, Benlian's attempt to cast Defendants' implementation of Act 129 and/or their receipt of government funds as state action fails. Consequently, having failed to assert a state action, Benlian's § 1983 claim cannot proceed in this forum.[14]

---

[14] This Court notes that Pennsylvania law sets out formal and informal procedures for addressing the shut off of one's electricity, handled by the Public Utility Commission and Bureau of Consumer Services. *See* 52 Pa. Code §§ 56.163, 56.173.

*42 U.S.C. § 1985(3) Claim*

Defendants also assert that Benlian has failed to sufficiently state a conspiracy claim under 42 U.S.C. § 1985(3) ("§ 1985(3)"). To state a claim under § 1985(3), a plaintiff must show, among other things, "a conspiracy" that is "motivated by a racial or class based discriminatory animus." *Scheib v. Butcher*, 602 F. App'x 67, 68 (3d Cir. 2015) (citing *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997)). In general, § 1985, like § 1983, does not create substantive rights but merely serves as a conduit for vindicating federal rights and privileges that have been defined elsewhere. *Spence v. Caputo*, 2015 WL 630294, at *30 (W.D. Pa. Feb. 12, 2015) (citing *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001)). Unlike § 1983, however, § 1985(3) reaches private actors. *See Mangan v. Brierre*, 257 F. App'x 525, 528 (3d Cir. 2007); *see also Okpor v. Rutgers, State Univ. of New Jersey*, 196 F. App'x 129, 130 (3d Cir. 2006) (finding that § 1985(3) protects individuals from deprivations of rights committed by either private or state actors as part of a conspiracy).

However, "[i]n the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel." *Brown*, 250 F.3d at 805 (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993)). In *United Bhd. of Carpenters and Joiners, Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983) and *Griffin v. Breckenridge,* 403 U.S. 88, 102-103 (1971), the Supreme Court has distilled the required elements to plead a claim under § 1985(3); *to wit*: (1) a conspiracy between two or more actors; (2) motivated by a racial or class-based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.

Benlian purports to support a claim of civil conspiracy under § 1985(3), claiming that: he was a "targeted victim of conspiracy perpetuated by Defendants," who deprived him of equal protection, and retaliated against him for sending the Affidavit Notice, Am. Compl. 32:14-16; that Defendants' "inner corporate body" decided to make an example of Benlian by shutting off his electricity to discourage others from taking similar action, *id.* at 34:27-35:3; that PECO lied to him about the smart meter being on his property for ten years, *id.* at 32:20-24; that Defendants "sidelined" the efforts of Mr. Ware, who suggested to Benlian the option of placing a smart meter on a pole at a safe distance away from Benlian's house, *id.* at 34:4-14; that Defendants conspired with unknown actors to suppress potential class action suits about the dangers of smart meters, *id.* at 33:22-25; and that Defendants' "committee" had a "meeting of the minds" by approving and implementing the electricity shut off on April 24, 2013, a day intentionally chosen to intimidate Benlian. *Id.* at 35:9-25. For the reasons that follow, however, Benlian's conspiracy claim lacks merit.

In *Robison v. Canterbury Vill., Inc.*, 848 F.2d 424 (3d Cir. 2008) the Third Circuit "joined a plethora of other federal courts in holding that an alleged conspiracy between a corporation and its officers or agents cannot satisfy the first element of a § 1985(3) claim." *Rose v. Morning Call, Inc.*, 1997 WL 158397, at *7 (E.D. Pa. Mar. 28, 1997). Similarly, under the "intracorporate conspiracy doctrine," a conspiracy under Pennsylvania law cannot arise between a principal and its agent because of the nature of the relationship. *Scheib*, 602 F. App'x at 68 (citing *Duffy v. Lawyers Title Ins. Co.*, 972 F. Supp. 2d 683, 698 (E.D. Pa. Sept. 17, 2013)). That is, "[i]t is well-settled that a corporation cannot conspire with its subsidiaries, its agents, or its employees." *Duffy*, 972 F. Supp. 2d at 698 n.32 (quoting *Michael v. Shiley, Inc.*, Civ. 93-1729, 1994 WL 59349, at *15 (E.D. Pa. Feb. 25, 1994), *aff'd in part, rev'd in part on other grounds*,

46 F.3d 1316 (3d Cir. 1995)); *see also Plemmons v. PMA Ins. Co.*, Civ. 90-2495, 1991 WL 125982, at *13 (E.D. Pa. July 3, 1991) ("Since a corporation, as a legal creation, can only act through its agents, an alleged conspiracy between a corporation and its agents is a conspiracy between an entity and itself, which is no conspiracy at all."). As noted earlier, PECO is an operating company wholly owned by Exelon. As pled in the amended complaint, Benlian essentially alleges a conspiracy between Exelon and PECO, a corporation and its subsidiary, among whom no conspiracy can exist.

Notwithstanding, two exceptions to the intracorporate conspiracy doctrine have been recognized for purposes of satisfying the conspiracy element in a § 1985(3) claim; *to wit*: a conspiracy between a corporation and its agent may be maintained (1) where the agent is alleged to have acted in a personal rather than corporate capacity, or (2) where an independent third party is alleged to have joined the conspiracy. *Robison*, 848 F.2d at 431. Here, Benlian has satisfied neither of these exceptions. Although he singled out several individuals who purportedly were supervisors of Defendants, Mr. Ware, Mr. Ludwig, and the unidentified supervisor who ordered the shut off at Benlian's home on April 24, 2013, Benlian does not sufficiently allege that these individuals acted in their personal capacity. Instead, all allegations point to actions on behalf of Defendants. Mr. Ware is the alleged supervisor of Defendants who spoke to Benlian about the possibility of placing the smart meter on a pole away from the house; the unidentified supervisor of April 24, 2013, was allegedly a member of the "committee" that decided to serve Benlian with the ultimatum of replacing the smart meter or having his electricity shut off; and Mr. Ludwig was the person who notified Benlian on behalf of PECO that electricity would be restored. Nowhere in the amended complaint has Benlian identified any other third party who was part of Defendants' purported conspiracy.

As a result, not only has Benlian failed to sufficiently plead the existence of a conspiracy and a violation of the only two rights protected under § 1985(3) – *i.e.*, the right to be free from involuntary servitude and the right to interstate travel – but he he has also failed to satisfy the existence of either of the two exceptions for a conspiracy.

*Section 504 / Rehabilitation Act Claim*

Finally, Defendants contend that Benlian does not have a private cause of action under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("§ 504" or "Rehabilitation Act"). In the amended complaint, Benlian avers that he is a qualified individual with disabilities and invokes § 504 to argue that Defendants retaliated against him by refusing to accommodate his disabilities and instead choosing to shut off his electricity. Referencing the $200 million grant from the U.S. Department of Energy, Benlian asserts that "[§] 504 creates a private right of action for individuals subjected to disability discrimination by any program or activity receiving federal financial assistance." Am. Compl. 38:18-19.

Section 504 is commonly referred to as the "civil rights bill of the disabled." *Three Rivers Ctr. for Indep. Living, Inc. v. Housing Auth. of the City of Pittsburgh*, 382 F.3d 412, 416 (3d Cir. 2004) (quoting *ADAPT v. Skinner*, 881 F.2d 1184, 1187 (3d Cir. 1989) (*en banc*)). It prohibits discrimination on the basis of disability by programs that receive federal funds. *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 432 (3d Cir. 2003). Specifically, the statute provides that:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

15

29 U.S.C. § 794(a).

By its terms, § 504 applies only to "program[s] or activit[ies]" receiving federal financial assistance and does not apply to individuals. *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002); *Fitzpatrick v. Pennsylvania, Dep't of Transp.*, 40 F. Supp. 2d 631, 637–38 (E.D. Pa. 1999). Though § 504 does not itself provide a private right of action for aggrieved individuals, it does provide that the "remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d *et seq.*] shall be available to any person aggrieved by any act or failure to act by any recipient of federal financial assistance or federal provider of such assistance under section 794 of this title." *Bowers*, 346 F.3d at 419 (quoting 29 U.S.C. § 794(a)(2)). Title VI provides that no person shall be excluded from participation nor subjected to discrimination by any program or activity receiving federal funds. 42 U.S.C. § 2000d.

Although the statute provides no private right of action, one has been *implied* that allows for both compensatory damages and injunctive relief. *Datto v. Harrison*, 664 F. Supp. 2d 472, 490 (E.D. Pa. 2009) (citing *Barnes v. Gorman*, 536 U.S. 181, 185-87 (2002)). Congress has also specifically provided that the remedies and procedures of Title VI are available to those seeking to enforce § 504. *Id.* (citing 29 U.S.C. § 794a(a)(2)); *Bowers*, 346 F.3d at 426 ("[A]lthough the remedy available to persons aggrieved by violations of the Rehabilitation Act . . . is at root an implied one, [the statute], by cross-referencing Title VI, which already had been interpreted as creating a private right of action, arguably [contains an] explicit provision[ ] creating a private right of action.").

The Third Circuit in *Three Rivers* addressed the issue of whether a private right of action exists to enforce regulations that an agency promulgates to a federal statute. For an *implied* right of action to exist, a statute must manifest Congress' *intent* to create the personal right and private

remedy. *Three Rivers*, 382 F.3d at 421 (citing *Sandoval*, 532 U.S. at 286) (emphasis provided). Thus, a determination must be made as to whether or not "Congress intended to confer individual rights upon a class of beneficiaries. Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285-86 (2002).

Congress' intent in enacting a statute is always the "focal point" in determining whether courts should infer a private right of action from the statute. *Three Rivers*, 382 F.3d at 421 (citing *Thompson v. Thompson*, 484 U.S. 174, 179 (1988)). The Supreme Court set forth in *Cort v. Ash*, 422 U.S. 66 (1975) four factors to guide a court's review in discerning such intent. *Three Rivers*, 382 F.3d at 421; *Thompson*, 484 U.S. at 179; *see also Hindes v. F.D.I.C.*, 137 F.3d 148, 169 (3d Cir. 1998). These factors are:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"–that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Fourth,] is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Three Rivers*, 382 F.3d at 421 (quoting *Cort,* 422 U.S. at 78 (citations omitted)).

"The first two criteria are critical. If they do not point toward a private right, the remaining two 'cannot by themselves be a basis for implying a right of action.'" *Am. Tel. & Tel. Co. v. M/V Cape Fear,* 967 F.2d 864, 866 (3d Cir. 1992) (quoting *Touche Ross & Co. v. Redington,* 442 U.S. 560, 580 (1979)). That is, for an implied right of action to exist, a statute must manifest Congress' intent to create (1) a personal right and (2) a private remedy. *See Alexander,* 532 U.S. at 286. Accordingly, courts must look to the enabling statute to find the

source of a right of action to enforce regulations, because "an agency's rulemaking power cannot exceed the authority granted to it by Congress." *Three Rivers*, 382 F.3d at 242 (citing *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 947 (3d Cir. 1985)).

In light of these factors, this Court opines that Benlian has failed to establish that Act 129 confers a personal right or private remedy. Benlian acknowledges the purpose of Act 129, statutorily embodied in 66 Pa. C.S. § 2807, is to "improve energy conservation in the state of PA, under the supervision, and legal framework set up by the PA PUC." Am. Compl. ¶ 11. In addition, a review of the enactment of Act 129 reveals that the Pennsylvania General Assembly declared the objectives served by the statute as:

> (1) the health, safety and prosperity of all citizens of this commonwealth are inherently dependent upon the availability of adequate, reliable, affordable, efficient and environmentally sustainable electric service at the least cost, taking into account any benefits of price stability, over time and the impact on the environment.
>
> (2) it is in the public interest to adopt energy efficiency and conservation measures and to implement energy procurement requirements designed to ensure that electricity obtained reduces the possibility of electric price instability, promotes economic growth and ensures affordable and available electric service to all residents.
>
> (3) it is in the public interest to expand the use of alternative energy and to explore the feasibility of new sources of alternative energy to provide electric generation in this commonwealth.

2008 Pa. Legis. Serv. Act 2008-129 (H.B. 2200).

While systemic legislation may in fact benefit a group of individuals, it does not mean that the legislation confers a personal right onto those individuals. "[T]he question whether a statute is *intended* to *benefit* particular plaintiffs is quite different from the question whether the statute *in fact benefits* those plaintiffs. . . ." *Three Rivers*, 382 F.3d at 419 (quoting *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 535 (3d Cir. 2002) (emphasis in original)). Personal rights are those intentionally and "unambiguously conferred" through "rights-creating"

language. *Id.* at 419-20 (quoting *Gonzaga*, 536 U.S. at 284; *see also Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 187-88 (3d Cir. 2004)). Personal rights inhere in the individual; they are "individually focused" and create "individual entitlements." *Three Rivers*, 382 F.3d at 419. Non-personal rights, by contrast: (1) often have a "systemwide" or "aggregate" focus; (2) are defined in terms of obligations of the person or entity regulated rather than in terms of entitlements of the individual protected; (3) are "not concerned with whether the needs of any particular person have been satisfied"; and (4) regard "institutional policy and practice, not individual instances" of conduct. *Id.* (citing *Gonzaga*, 536 U.S. at 282; *Sandoval*, 532 U.S. at 288-89; *Blessing v. Firestone*, 520 U.S. 329, 343-44 (1997)).

As alluded to, Act 129, through its enabling statute at 66 Pa. C.S. § 2807, sets forth the duties of electric distribution companies. In this Court's view, the non-personal aspects of Act 129 are evident. First, its focus is "systemwide" in that "each electric distribution company shall maintain the integrity of the distribution system . . . in conformity with the National Electric Safety Code and such other standards practiced by the industry in a manner sufficient to provide safe and reliable service to all customers connected to the system." § 2807(a). Second, Act 129 defines obligations of the entity regulated, *i.e.*, electric distribution companies, rather than in terms of entitlements of the individual protected, *i.e.*, electric customers, such as Benlian. Third, Act 129 establishes general consumer protections and regulations to be followed by electric distribution companies and is not necessarily concerned with whether the needs of any particular customer have been satisfied. Lastly, Act 129 sets forth institutional policy and practice with respect to the implementation of smart meter technology, not as to specific, individual instances of conduct.

PECO is one of more than 200 electric utility companies to receive a Smart Grid Investment Grant from the U.S. Department of Energy, as part of the American Recovery and Reinvestment Act of 2009 ("ARRA"), for the purpose of stimulating the economy by, *inter alia*, modernizing the electric grid.[15] In light of the stated objectives of Act 129, this Court is constrained to conclude that Act 129 was intended not to confer an "especial personal benefit," but rather, to provide for overall improvements to the nationwide grid to benefit a wider group of individuals. As such, Act 129 reveals no federal implied right in favor of Benlian. Consequently, Benlian cannot support a private right of action against Defendants under the Rehabilitation Act.

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss is granted. An Order consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO
*Judge, United States District Court*

---

[15] Energy.Gov, *Recovery Act: Smart Grid Investment Grants*, http://energy.gov/oe/recovery-act-smart-grid-investment-grants; *see also* Exhibit "C(e)1." This Court notes also that there has been no suggestion that Congress, when it enacted the ARRA, intended to create a personal right or a private remedy that would sustain a private right of action. As noted above, the ARRA was enacted to stimulate the economy, and the Smart Grid Investment Grant from the U.S. Department of Energy was established to modernize the United States' electrical power grid. *E.g.*, *Naperville Smart Meter Awareness v. City of Naperville*, 114 F. Supp. 3d 606, 609 (N.D. Ill. 2015). The ARRA, and the grant of federal funds to electricity providers, was not intended to create a private right of action against electricity providers that used the funds for their intended purpose—modernizing the electrical grid. As with Act 129, this Court concludes that the ARRA and the Smart Grid Investment Grant did not confer a "personal benefit" but rather provided funds to create systemic improvements to the electrical grid for the benefit of the populace as a whole. Benlian cannot, therefore, assert a private right of action based on the ARRA against Defendants under the Rehabilitation Act. *See Three Rivers*, 382 F.3d at 419-22.